637 So.2d 1115 (1994)
STATE of Louisiana
v.
Lee MILLER.
No. 93-KA-1096.
Court of Appeal of Louisiana, Fourth Circuit.
May 17, 1994.
*1116 Harry Connick, Dist. Atty., Frederick A. Menner, Jr., Asst. Dist. Atty., New Orleans, for appellee.
Ginger Berrigan, Gravel, Brady & Berrigan, New Orleans, for appellant.
Before CIACCIO, WARD and ARMSTRONG, JJ.
CIACCIO, Judge.
Defendant, Lee Miller, was convicted of forcible rape and simple kidnapping, violations of R.S. 14:42.1 and R.S. 14:45, respectively. On count one, forcible rape, he was sentenced as a second offender to serve forty-five years at hard labor without benefit of probation, parole or suspension of sentence, or good time. As to count two, simple kidnapping, he was sentenced to five years at hard labor, to run consecutively with the sentence in count one. Defendant appeals his conviction and sentence.
The victim, K.W., testified that he was playing basketball near his grandmother's house on August 12, 1991. He stated that the defendant approached him and offered him $2.00 if he would help change a light fixture. After agreeing, he was led by the defendant to an abandoned house where they entered through the back door. The light fixture was located in the ceiling, and the defendant offered to give him a "boost". Instead of boosting him up, the defendant told K.W. to lie down. The defendant's mood became angry. He closed the door and informed the victim that there was nowhere to run. The defendant removed each of their pants, rubbed moisturizer on the victim's buttocks, and proceeded to have anal intercourse with the victim. The defendant told the victim that he would beat him if he did not stop crying. Before leaving the scene, the defendant told the victim that he was going to find out where he lives.
K.W. ran to his grandmother's house where he called his mother. The police were also called. Upon arriving at the grandmother's house, the police took the victim back to the abandoned house.
*1117 Sergeant Thomas O'Shaughnessy of the New Orleans Police Department testified that the back door of the house was unsecured. Found on the floor of the room where the incident occurred was a set of keys. The perpetrator was described as a black male, between the ages of twenty and thirty years old, approximately six feet tall and 150 pounds, with black hair combed straight back, a spotty beard and stained, yellowish teeth. He was wearing a purple and blue shirt with white stripes and blue jeans. A crime scene technician was called to the scene to take photos. No fingerprints were lifted from the scene and no attempt was made to match the keys to any lock associated with the defendant. On August 14, 1991, Sergeant O'Shaughnessy transported the victim to a composite artist to compile a drawing of the perpetrator.
The victim's mother, L.W., took him to the Medical Center of Louisiana (Charity Hospital) to be examined. Dr. Michael McGoohan performed the rape examination on K.W. He stated that the rectal exam was positive in that there was a tear in the anus, the area around the anus was red and swollen, and that the sphincter tone had decreased. Otherwise, there were no bruises or cuts on the victim and no blood or sperm were found.
Roughly one week after the incident, August 18, 1991, K.W. was again playing basketball outside his grandmother's house when he saw the defendant walking down the street. He testified that he immediately recognized the defendant's face and ran to his relatives, claiming that the defendant was the person who had attacked him. K.W. remained at the house while his mother, aunt, and aunt's boyfriend followed the defendant in two separate automobiles. They also called the police.
Both the mother and aunt testified that the defendant was walking alone at first. He then came upon a young boy on Galvez Street whom he spoke to, and he and the boy walked off together. They continued walking up and down the streets of the area, and returned to Galvez Street. At that point, the defendant left the boy standing on the neutral ground and started to cross the street; however, the police arrived and he was arrested. The arresting officers recovered a brown bag from the defendant containing a new jar of vaseline and light fixtures.
The defendant was taken to the police station. The victim was accompanied to the police station by his family where he made a one-on-one identification of the defendant. The victim cried when he saw the defendant at the station.
Lee Miller, the defendant's father, testified. He stated that he was a barber and that in late May, his son had a "Jerri" curl put in his hair. He also stated that the treatment for the curl irritated his son's skin and that he cut the curl out, leaving his son's hair approximately one inch in length. He testified that his son does not grow a beard because it grows in spots, and that his son was very clean, walking around with a comb and toothbrush in his pocket.
Ms. Willie Blackman also testified that the defendant was a very clean person. The defendant worked for Ms. Blackman taking care of her ill son. She stated that when the defendant first began working for her in early June, he had a "Jerri" curl, but that he cut it off approximately three weeks prior to his arrest. She said that the defendant was always clean shaven and that she would see him on occasion put vaseline in his hair and on his skin. She also testified that the defendant carried a toothbrush with him and frequently brushed his teeth.
The defendant denied raping and kidnapping K.W. He stated that the first time he ever saw the victim was on the day he was arrested. He confirmed that he had a "Jerri" curl early in the summer which he cut short after the oil irritated his skin. He denied ever wearing his hair combed straight back and ever having a beard. He testified that he was doing some work on his grandmother's apartment and that he used vaseline in his hair and on his body to keep paint from staining his skin. He stated that he brushes his teeth four to six times a day.
When asked where he was going on the day he was arrested, the defendant stated that he was heading over to a friend's house. He said that he was walking erratically through the neighborhood because people *1118 were yelling at him and cars were following him. When asked about the young boy he was walking with, the defendant stated that the child came up to him and asked for a quarter, and that there was a woman with him who he presumed was the child's mother.
A review of the record shows one errors patent. On the forcible rape conviction, the relator was sentenced as a second offender to forty-five years at hard labor without benefit of parole or good time. Neither R.S. 14:42.1 or R.S. 15:529.1, the two statutes under which the defendant was sentenced, provides for the denial of good time, although as a multiple offender the defendant may be ineligible under R.S. 15:571.3. This Court has held that a trial court may not deny a defendant good time credits even though he may be ineligible by law. State v. Melancon, 536 So.2d 430 (La.App. 4th Cir.1988). The trial court erred in denying the defendant good time.
In his first assignment of error, defendant argues that the trial court erred in refusing to declare a mistrial after the trial judge made a comment to K.W., the chief prosecution witness, in the presence of the jury. At the close of the victim's testimony, defense counsel heard the trial judge tell K.W., "you did a good job".
In support of his argument, the defendant relies on State v. Cook, 485 So.2d 606 (La.App. 4th Cir.1986), writ denied, 493 So.2d 632 (La.1986). In Cook, the defendant was accused of raping a ten year old girl. After the girl testified, the trial judge, in the presence of the jury, handed the child a piece of candy. On appeal, we found that the gesture was reversible error, concluding that the action in the jury's presence could be viewed by the jury as an indirect comment on this witness' veracity.
LSA-C.Cr.P. art. 772 provides that:
The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.
However, under LSA-C.Cr.P. art. 770, a mistrial is mandatory only if the judge, district attorney, or a court official directly or indirectly makes an impermissible reference to race, religion, color or national origin, or to another crime which defendant may have committed, or the failure of defendant to testify, and under these circumstances the motion for mistrial must be granted if the defense requests it. LSA-C.Cr.P. art. 770. Mistrial is a drastic remedy and, except in instances in which mistrial is mandatory, is warranted only when a trial error results in substantial prejudice to the defendant depriving him of a reasonable expectation of a fair trial. State v. Anderson, 526 So.2d 499 (La.App. 1st Cir.1988), writ denied, 537 So.2d 1160 (La.1989). If a motion for mistrial is denied, and the improper remark does not fall within the prohibitions of C.Cr.P. art. 770, the appellate court will reverse the conviction only if it is "thoroughly convinced" the jury was affected by the remark. State v. Messer, 408 So.2d 1354, 1357 (La.1982).
The defense attorney in this case urged the court to grant a mistrial stating, "Your honor, after K.W. testified and I was sitting some fifteen feet away, I heard your honor say to him, `you did a good job', and in the hearing of the jury."
Upon denying the motion for the mistrial, the trial judge stated:
I am going to deny your mistrial. We're dealing with a fourteen year old boy who was, in essence, terrified here before this court, who had to be reassured before he could testify, who visibly shook throughout his testimony, whose voice and demeanor indicated someone who was terribly traumatized throughout his testimony. It was extremely difficult, in my estimation, in recounting these events as they took place. As the child rose to leave he was visibly shaken by not only saying these things, in relating what happened to him, but also by the cross-examination. I felt that. I whispered to him that he had done a good job. I don't believe that those comments were interpreted by the jury in any way as a reflection of my feelings regarding the credit of his testimony, nor do I believe that my commendation of this young man *1119 constitutes grounds to qualify as a reversible error.
Further, the district attorney and court reporter informed the judge that they did not hear the judge's comment.
The trial court's remark in the case before us did not constitute a comment upon the facts of the case, nor did it constitute an opinion as to what facts were proved or not proved by the victim's testimony. Furthermore, the district attorney's and court reporter's statements to the court that they did not hear the remark and the fact that the remark is not transcribed in the record, support the trial judge's assertion that he whispered the remark. Unlike Cook, where the trial judge's action was overt and discernible, the trial judge's remark here was discreet and not fully disclosed. In light of this, we are not convinced that the jury heard, much less was affected by, the remark or that the remark resulted in substantial prejudice to the defendant depriving him of a fair trial.
The trial court did not err in denying defendant's motion.
In his second assignment of error, the defendant argues that the trial judge erred in failing to declare a mistrial when the prosecution repeatedly elicited evidence of alleged other crimes committed by the defendant for which no Prieur notice had been given, citing LSA-C.E. art. 404(B). The testimony at issue took place between the prosecutor and witnesses, Juanita Harris, L.W., and the defendant, Lee Miller. The following testimony deals with what occurred on the day the defendant was arrested, August 18, 1991.
Juanita Harris testified that after the defendant walked down a couple of blocks, he stopped and began talking to this little boy. She stated that "he took the little boy and went out."
L.W. testified that when the defendant got by Third and Galvez, "he picked up this little boy" and that they were "steady walking." She also stated that she asked the little boy whether he knew the defendant, and he replied, "no".
On cross-examination, the State questioned the defendant asking him whether he "walked up to a child", and "didn't he start walking off with another little child". The State also asked how far the defendant walked with the child and again asked the defendant, "didn't you meet up with a child and start walking".
Following the testimony of Juanita Harris, defense counsel objected to the introduction of the evidence because she did not receive any pretrial notice.
The following colloquy took place:

The Court: Ms. Berrigan, I think the question is thatif we're going to turn on the purpose for which that testimony was offered, that is not offered as evidence of a crime, nor was it evidence of a method of operation. It was simply the observations of the persons who participated in the arrest of the defendant. And that testimony, if left out, would have beenwould have resulted in an incomplete picture of the circumstances surrounding the arrest of your client, so for that reason, I'm denying the motion.

Ms. Berrigan: Are you stating also that it is not res gestae for the record?

The Court: I think it's res gestae as to the arrest. It's not part of the matter or the charges which your client is facing right now, because it didn't happen on the same day. But if he was walking down the street with a circus clown, I think that would be testimony as to whoever his companion was and would be admissible because it's part of the totality of the circumstances surrounding his arrest. It just so happens that it was a little boy.
The defendant urges that the State elicited the testimony to imply that the defendant had the propensity to commit other acts of misconduct. The state, on the other hand, argues the evidence was relevant and admissible.
LSA-C.E. art. 404(B) states in part:
(1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as *1120 proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Relevant evidence is defined in LSA-C.E. art. 401 as "evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." All relevant evidence is admissible, except as other wise provided by the Constitution of the United States, the Constitution of Louisiana, the Code of Evidence, or other legislation. Evidence which is not relevant is not admissible. LSA-C.E. art. 402. The trial judge is vested with wide discretion in determining the relevancy of evidence and his ruling will not be disturbed on appeal in the absence of a clear showing of abuse of discretion. State v. Miles, 402 So.2d 644 (La.1981).
The state argues that the complained of evidence was admissible to establish that the individual K.W. had pointed to and said "That's him, that's him!" was the same person apprehended several blocks away shortly thereafter; and, that the testimony was to clarify the Officer Michael Brenkle's mistaken view that K.W. had made an identification at the scene of the arrest.
The record reflects that the identification issue was raised by defendant at trial. Defendant argued that no photographic or physical lineup was conducted and that the one on one identification at police headquarters was suggestive, improper and suspect. The state explained that an independent identification was made by the victim earlier on the street as he played basketball. The state elicited the testimony to establish that the victim's relatives followed the defendant from the initial identification by K.W. until defendant was apprehended and that there were no intervening circumstances which would have unduly influenced K.W. to misidentify the defendant. The record further reflects that Officer Brenkle, the first officer to arrive on the scene to arrest the defendant, testified that he initially believed that the victim was the young boy with the defendant when he made the stop. He further testified that at the prior motion to suppress the identification hearing he had testified that there was an on site identification by the victim because he was under the mistaken belief that the child with the defendant at the time of the arrest was the victim.
After reviewing the record we do not find that the complained of testimony constituted evidence of other crimes, wrongs, or acts elicited to prove the character of the defendant in order to show that he acted in conformity therewith. We find, as did the trial judge, that the testimony was admissible as it was strictly limited to circumstances surrounding defendant's identification and arrest. We find the trial judge did not abuse his discretion in allowing the testimony.
Accordingly, for the above reasons, defendant's conviction is affirmed. Defendant's sentence on count one is amended to delete that portion denying good time and, as amended, affirmed.
CONVICTION AFFIRMED; SENTENCE AMENDED AND, AS AMENDED, AFFIRMED.